## IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA ALBANY DIVISION

JEAN LAMB,                                  :
                                           :
     Plaintiff,                       :
                                           :
v.                                         :          CASE NO.: 1:19-CV-150 (LAG)
                                           :
OUTBACK STEAKHOUSE OF                      :
FLORIDA, LLC, *et al.*,                    :
                                           :
     Defendants.                      :
_____ :

## ORDER

Before the Court is Plaintiff Jean Lamb's Motion for Sanctions against Defendant Outback Steakhouse of Florida, LLC (Motion) (Docs. 43–44). For reasons explained below, the Motion is **GRANTED**.

### PROCEDURAL BACKGROUND

This action arises out of injuries Plaintiff sustained when she slipped and fell at an Outback Steakhouse restaurant. (*See* Doc. 1-3 at 15, 18–19). On July 17, 2019, Plaintiff filed a Complaint against Outback, as well as other defendants, in the Superior Court of Dougherty County, raising claims for premises liability and negligence per se. (*Id.* at 13–23). On September 3, 2019, Outback removed this action to this Court. (Doc. 1). On September 5, 2019, Outback filed an Amended Notice of Removal. (Doc. 3). On September 28, 2020, Plaintiff filed a Motion for Sanctions against Outback. (Doc. 43). On September 29, 2020, Plaintiff filed an Amended Motion for Sanctions to include an email as an exhibit that was omitted from its original motion. (Doc. 44 at 1). Outback responded on October 19, 2020, and Plaintiff replied on October 29, 2020. (Docs. 45–46). The Court held an evidentiary hearing on the Motion on August 11, 2021. At the hearing, the Parties stated that all of the evidence on which they planned to rely was already in the record. (Doc. 73

at 3:12–20).[1] The Court ordered the Parties to file closing briefs by August 30, 2021. (*Id.* at 78:15–80:5). The Parties timely filed their briefs. (Docs. 74–76).[2] Accordingly, the Motion is ripe for review. M.D. Ga. L.R. 7.3.

## FACTUAL BACKGROUND

### I.     Outback's Personnel, Policies, and Procedures

The relevant facts are undisputed. Outback Steakhouse is a limited liability company. (Doc. 1-3 at 13). At the time of the incident, Steve Johnson was the managing partner but was not working at the restaurant due to an illness. (Doc. 45 at 2; Doc. 52 at 25:25–26:8). Harlee Chitwood, therefore, was the interim managing partner and acting proprietor. (Doc. 50 at 17:23–18:11; Doc. 52 at 26:9–11, 36:9–13). Donald Hendrix is an Outback "salaried manager" who worked at Outback when Plaintiff fell. (Doc. 50 at 10:5–14, 17:23–18:21; *see also* Doc. 45 at 2). Tiffany Chambers was a "key manager" working at Outback during the incident. (Doc. 52 at 17:16–18:13, 32:16–22; *see also* Doc. 45 at 2). Key managers are a step under salaried managers. (Doc. 52 at 18:5–13). Although key managers run shifts and make decisions regarding which personnel work on a particular day, they must run "important decisions" through a salaried manager. (*Id.*). Latoya Nichols was the "front of the house manager," which she described as the assistant manager under Johnson. (Doc. 49 at 17:15–17). Nichols was not working at the restaurant when Plaintiff fell. (Doc. 49 at 28:23–25, 35:10–17). Johnson has since passed away, and Chitwood no longer works at Outback. (Doc. 45 at 2).

Outback managers are required to complete three types of checklists each day: opening manager's checklists, quality assessment report (QAR) checklists, and sanitation checklists. (Doc. 50 at 15:22–16:10, 31:7–12). The manager's opening checklist requires the manager to indicate the condition of the floors, and the QAR checklist provides managers with guidelines regarding good hygienic practices, the facility, and workplace safety, among other topics. (Doc. 45-1 at 1; Doc. 45-3 at 1). The QAR checklist specifically

---

[1]     Plaintiff's Exhibits 2 and 19 were admitted for purposes of the hearing only. (Doc. 73 at 6:18–7:12, 71:8–17).
[2]     After Outback filed its initial closing brief, it filed a supplemental brief that amended its initial brief by including the declaration of Bryan Vadnais. (Doc. 76 at 1).

instructs managers to clean the floors of debris and build-up as often as necessary and to inspect floors for good repair and cleanliness regularly. (Doc. 45-1 at 28–29). Based on the record, it is unclear what the sanitation checklist covers. After completing a checklist, the manager places it in a binder where it remains for thirty days. (Doc. 52 at 59:5–61:20). After the thirty days, the checklists are moved to a folder or envelope, held for three months, and then discarded. (*Id.*; Doc. 50 at 15:22–17:12). The managers also use a Manager's Daily Log to "communicate about anything that happened throughout [their] shift." (Doc. 52 at 68:16–20). This type of log is kept in a notebook, but it is unclear how long Outback retains it. (*See* Doc. 52 at 68:16–71:3). According to Hendrix, he would have included information about Plaintiff's accident in the daily log. (Doc. 50 at 40:17–41:9). Chambers, on the other hand, testified that she would not have included this information in the log, but, instead, would have texted her manager partner. (Doc. 52 at 70:9–71:3).

Outback has policies and procedures regarding how to handle accidents. (*See id.* at 14:7–11). If an accident occurs, Outback personnel are supposed to gather all the pertinent evidence, including the managers' checklists. (*Id.* at 14:19–15:5). A manager is supposed to call an ambulance if necessary and also "call [] in" the incident to relay what happened, when it happened, and which individuals may have additional information for any future statements. (Doc. 49 at 29:19–30:21; *see also* Docs. 44-2–44-4). The Outback employee receiving the manager's incident call then creates a report and emails the report back to the manager and Outback's lawyers, and the incident is handed off to Outback's claims department. (Doc. 49 at 30:5–13, 31:13–32:11). The email with the report also contains instructions that sometimes require Outback personnel to reply with additional information about the incident within a certain timeframe. (*Id.* at 32:14–33:6).

Outback's retention policy requires that surveillance videos are to be stored for about fourteen days. (Doc. 61-14 at 40:15–23). Outback personnel were not consistent when explaining how surveillance videos are accessed and used after an incident in a restaurant. Charles Best, who oversees eight Outback restaurants in Georgia and Alabama, testified that there is no written training document that instructs managers to review video footage if a patron has an accident. (*Id.* at 39:9–40:1). Chambers testified that only salaried

managers in training are taught to secure video surveillance when an incident occurs, and that every salaried manager should know how to secure surveillance in the restaurant. (Doc. 52 at 23:7–18, 27:8–23). Chambers explained that only salaried managers, and not key managers, can access the surveillance system. (*Id.* at 21:23–22:3, 23:5–23). Chambers clarified that, at the time of Plaintiff's accident, a manager would have been instructed to secure the surveillance. (*Id.* at 24:8–12). She testified, however, that she was unsure whether Outback had a specific policy or procedure that required a manager to secure surveillance footage during an incident. (*Id.* at 24:8–25:11). Nichols testified that managers are not instructed on what to do with surveillance footage if an incident occurs and the "store manager" is usually the only person with access to the surveillance system. (Doc. 49 at 30:25–31:8). Hendrix testified that Outback trains personnel to review surveillance footage after an incident, and someone in Chitwood's position would have received that training. (Doc. 50 at 19:1–22). Hendrix, however, did not know how to operate the surveillance system. (*Id.* at 17:23–18:11).

## II.    Plaintiff's Accident

On February 21, 2019—the day of the accident—Chambers testified that she completed an opening manager's checklist and QAR checklist at 10:00 a.m. and placed them in a binder in the office. (Doc. 52 at 59:5–60:21). After Plaintiff slipped and fell in the restaurant lobby, she testified that was in "incredible" pain and her leg swelled. (Doc. 54 at 28:19–21, 34:10–12, 40:22–25). Chambers notified Hendrix about the fall in accordance with her training and "called in the incident report" as Hendrix tended to Plaintiff. (Doc. 52 at 35:24–36:18). Chambers sent Chitwood a text about the incident. (Doc. 52 at 70:9–71:3). Hendrix asked Plaintiff if she needed an ambulance and called for one when she said yes. (Doc. 50 at 20:17–21:10). Plaintiff stayed in the hospital for about eight days, during which she had surgery. (Doc. 54 at 60:15–18, 61:10–12). She then went to the Lee County Health and Rehab facility,[3] where she stayed for twenty-one days. (*Id.* at 60:15–61:6).

---

[3]    Throughout Plaintiff's deposition, the Parties refer to the Lee County Health and Rehab facility as either "rehab" or "the nursing home." (*See* Doc. 54 at 60:21–61:3).

Neither Chambers nor Hendrix witnessed the fall, (Doc. 50 at 20:15–23; Doc. 52 at 33:22–34:3), but Outback's surveillance system would have captured it. (Doc. 44 at 4; *see also* Doc. 50 at 20:1-5; Doc. 52 at 22:7–15). John David Hunsinger, an Outback employee, saw Plaintiff fall "[f]rom the other side of the room." (Doc. 61-16 at 3:10–23). At some point that day, Hendrix told Chitwood that Chitwood needed to review the surveillance footage of the accident but is not sure whether she did. (Doc. 50 at 18:15–19:7). Besides the food and tea Plaintiff spilled when she fell, both Chambers and Plaintiff testified that they saw nothing on the floor at the time of the fall. (Doc. 52 at 67:24–68:8; Doc. 54 at 34:25–35:8).

On February 22, 2019—the day after Plaintiff slipped and fell—an employee from Outback's corporate office called Plaintiff while she was in the hospital, but it is unclear what they discussed. (Doc. 54 at 57:8–22). Plaintiff contacted the same employee while she was in the rehab facility to see if Outback would compensate her for her injuries, but the date Plaintiff made the call is unclear. (*Id.* at 57:20–58:12). The employee informed Plaintiff that someone would contact her in about a week. (*Id.* at 58:13–15). No one contacted Plaintiff until about three or four weeks later. (*Id.* at 58:16–20). By this point, however, Plaintiff had spoken with her attorney and was advised to no longer speak with any Outback employees. (*Id.* at 58:17–23).

On February 22, 26, and 27, 2019, Tristal Hall, a risk-management employee at the restaurant-holding company that owns Outback, Bloomin' Brands, contacted Outback for information about the accident. (Docs. 44-2–44-4; *see also* Doc. 45-1). Hall asked Outback to send her: (1) at least two photos of the area where Plaintiff fell; (2) a written statement describing the incident and the condition of the floors from any witness; (3) a copy Plaintiff's check from her lunch; and (4) any surveillance footage of the incident. (Doc. 44-2). Hall noted in her February 27, 2019, email that Plaintiff had consulted with an attorney. (Doc. 44-4 at 1). On February 27, 2019, Best asked Chitwood to "[p]lease respond back to this email," apparently referencing Hall's earlier emails. (Doc. 44-5; Doc. 45 at 2). On February 28, 2019, Best, Chitwood, and Hall received an email with a witness's description of Plaintiff's accident from a general outback email account.

(Doc. 44-5). According to Best, the video of the incident was available and accessible when Hall sent these emails. (Doc. 61-14 at 48:23–49:3).

## III.   Discovery Inquiries

On April 9, 2019, Plaintiff sent a spoliation letter to Outback, demanding preservation of the following: all (1) photographic and video recordings of Plaintiff on February 21, 2019; (2) photographic and video recordings of any interior areas in the Albany, Georgia Outback on February 21, 2019; and (3) incident reports or other reports concerning the accident. (Doc. 44-6 at 4). On November 8, 2019, Plaintiff served Outback requests for production of documents, seeking in relevant part: (1) policies and procedures related to cleaning, maintenance, inspection, and investigation; (2) surveillance and efforts made to preserve surveillance; and (3) all documents related to Outback's investigation of the incident. (Doc. 44 at 5; Plaintiff's First Request for Production of Documents to Defendants ¶¶ 2, 8, 10 (on file with the Court)). That same day, Plaintiff also served Outback her First Continuing Interrogatories, asking in relevant part for Outback to "[s]tate what measures, if any, were made to preserve any evidence related to this case to include, without limitation, any surveillance video." (Plaintiff's First Interrogatories ¶ 6 (on file with the Court)).

On December 6, 2019, Defendant partially responded to Plaintiff's initial discovery requests. (Doc. 44 at 5; Letter from Patrick Flynn, Attorney for Plaintiff, to Bert Noble, Attorney for Defendant (Dec. 19, 2019) (on file with the Court)). In response, Plaintiff sent Outback a letter on December 19, 2019, noting that Outback made boilerplate objections and partial responses to virtually every interrogatory and request for production, and requesting more complete responses. (Letter from Patrick Flynn). The parties met and conferred about their discovery issues on December 21, 2020, and Outback agreed to produce additional documents and supplement its interrogatory responses. (Email Chain 2 (on file with the court)). On January 8, 2020, Plaintiff emailed the Court requesting a discovery conference because Outback still had not produced the documents and responses. (*Id.*). On January 15, 2020, Outback submitted its First Supplemental Responses to Plaintiff's First Continuing Interrogatories, in which Outback withdrew its general

objections to its first response and noted in response to Plaintiff's discovery dispute letter that no information or documents were withheld from the first production based on privilege. (Doc. 61-20 at 1).

The Court held a conference on February 20, 2020, and gave Plaintiff leave to file a motion to compel if needed by March 20, 2020. (Doc. 28). The Court also ordered the Parties to confer and file a proposed scheduling and discovery order with new deadlines. (*Id.*). Defendant subsequently supplemented it responses to Plaintiff's discovery requests, and Plaintiff never filed a motion to compel. (Doc. 44 at 5; *see also* Docket.).

On August 13 and 14, 2020, Plaintiff deposed Outback and some of its employees and learned that Outback had not produced all documents responsive to Plaintiff's discovery requests. (Doc. 44 at 5; *see also* Email Chain 3 (on file with the Court)). On August 19, 2020, Plaintiff requested Outback to produce those documents. (Doc. 44 at 6). On September 1, 2020, Outback produced one additional document related to management training and indicated that it no longer had some responsive documents, the video surveillance, the incident reports, the manager's daily logs, and the QAR checklist. (*Id.*). On September 21, 2020, Outback emailed Plaintiff, informing her that it was still working on obtaining training videos. (Doc. 44-1). Outback attached Hall's February 2019 emails and Best's email to Chitwood from February 27, 2019, to its message to Plaintiff. (*Id.*; Doc. 44 at 6; Docs. 44-2 to 44-5). On November 20, 2020, the Court held another hearing in response to Plaintiff's September 15th email regarding the ongoing discovery issues and ordered the Parties to confer and confirm identification and deposition dates for the remaining fact and expert witnesses. (Doc. 55). The Court also gave Plaintiff permission to file a motion to compel if Outback failed to confirm deposition dates by December 11, 2020. (*Id.*). Plaintiff never filed a motion to compel. (*See* Docket).

## DISCUSSION

Plaintiff moves to sanction Defendant under Federal Rules of Civil Procedure 26 and 37 and the Court's inherent powers for "spoliation of evidence as well as the concealment of documents responsive to Plaintiff's discovery requests." (Doc. 44 at 1). Plaintiff argues that Defendant "destroyed surveillance of the subject incident in the face

of orders to preserve and produce to the risk management division of Defendant Outback the day after the subject incident." (*Id.*). Plaintiff also contends that Defendant destroyed inspection reports related to the condition of the floor at the time of the subject incident and the reports from the days leading up to the incident. (*Id.* at 1–2). When referencing inspection reports, Plaintiff names the opening manager's checklist, QAR checklist,[4] Manager's Daily Logs, and "other 'more detailed' inspection reports" as indicated in Outback's deposition. (*Id.* at 3, 8).[5] Plaintiff contends that Defendant also has not explained what happened to the inspection reports that Plaintiff requested. (Doc. 46 at 4, 6).

Plaintiff, citing Hendrix's deposition, contends that the inspection reports represent the best evidence of the condition of the floors on the day of the incident. (*Id.* at 13). During the hearing, Plaintiff argued that she needs the Manager's Daily Logs because she believes an accident like hers would have been recorded in the logs. (Doc. 73 at 8:19–24). She also reiterated her belief that the opening manager's checklist would indicate the condition of the floor on the day Plaintiff fell. (*See id.* at 50:6–10). Further, Plaintiff argues that Defendant initially concealed emails related to the investigation of the incident at issue, and only produced them after Plaintiff asked the Court to intervene. (Doc. 44 at 2).

Regarding the surveillance video, Plaintiff argues that the video is central to understanding how Plaintiff slipped and fell and whether other people slipped or fell in the same area before her. (*Id.* at 11). Plaintiff also contends that photographic evidence or testimony would not cure the loss of the video, the absence of the video is prejudicial, and the video's inexplicable disappearance shows that Outback destroyed the video in bad faith. (*Id.* at 12–13). Further, Plaintiff points out that, notwithstanding Defendant's explanation for not maintaining the video, Defendant still has not explained the steps taken to preserve

---

[4]    During the evidentiary hearing, Plaintiff stated that she is "not taking any issue with the QAR reports." (Doc. 73 at 44:7–12). With the understanding that Plaintiff no longer found the QAR checklist important to the spoliation argument, Outback did not address the QAR checklist in detail. (*Id.* at 44:14–48:15). The Parties also did not address the QAR checklist in their closing briefs. (*See generally* Docs. 74–76). The Parties thus seem to have dropped the QAR checklist as an issue. To resolve Plaintiff's Motion clearly, however, the Court will still address the QAR checklist for purposes of Plaintiff's spoliation argument.

[5]    Although Plaintiff cites to Outback's deposition (*See* Doc. 44 at 2–3), she did not attach the deposition to her Motion, and the Court cannot locate the deposition on the record.

the video and what ultimately happened to the video. (Doc. 46 at 4).

In response, Defendant argues that the checklists are not material to this case. (Doc. 45 at 2–3). With regard to the surveillance video, Defendant admits that the relevant surveillance video was not maintained but argues it did not act in bad faith. (Doc. 45 at 1). Specifically, Defendant asserts that, two months before Plaintiff sent its April 9th letter regarding evidence preservation, Defendant tried to determine whether surveillance video existed and what information would be available following the incident. (*Id.*). Additionally, Defendant contends that its delay and failure to preserve the video are due to different managers transitioning in and out of the position responsible for Defendant's video system. (*Id.* at 2). Further, Defendant argues that the checklists Plaintiff sought are not material to this case. (*Id.* at 2–3). In reply, Plaintiff argues that, despite Defendant's explanation for not maintaining the video, Defendant has not explained the steps taken to preserve the video and what ultimately happened to the video. (Doc. 46 at 4).

## I.    Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Alston v. City of Darien*, 750 F. App'x 825, 835 (11th Cir. 2018) (per curiam) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). The moving party has the burden of establishing spoliation. *Temple v. Cox*, No. 2:18-CV-91, 2020 WL 6566177, at *3 (S.D. Ga. Nov. 9, 2020). To establish spoliation, Plaintiff must show that: (1) the "missing evidence existed at one time"; (2) the spoliating party had a duty to preserve the evidence; and (3) the evidence was crucial—not just relevant—to the moving party's ability to prove her case. *Id.* (citation omitted); *Alston v. City of Darien*, No. CV 216-66, 2017 WL 5560278, at *7 (S.D. Ga. Nov. 17, 2017). When determining spoliation sanctions, courts consider the following factors:

> (1) whether the [moving party] was prejudiced as a result of the destruction of evidence; (2) whether the prejudice could be cured; (3) practical importance of the evidence; (4) whether the [spoiling party] acted in good or bad faith; and (5) the potential for abuse if expert testimony about the evidence was not

excluded.

*Alston*, 750 F. App'x at 835 (alteration in original) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 945 (11th Cir. 2005)). The fifth factor is irrelevant here because there is no expert testimony at issue.[6]

### A. Checklists and Manager's Daily Logs

Plaintiff fails to demonstrate that the loss of the opening manager's checklist, QAR checklist, and Manager's Daily Logs amounts to spoliation. The opening manager's and QAR checklists existed at one time as Chambers testified that she completed them the morning Plaintiff slipped and fell. (Doc. 52 at 59:5–60:17); *see also Lowery v. Off. Depot, Inc.*, No. 1:07-CV-1614-CC-CCH, 2009 WL 10700357, at *7 (N.D. Ga. Jan. 23, 2009) (reviewing the record to determine whether plaintiff produced evidence of spoliation despite plaintiff's failure to include any facts regarding spoliation in his statement of material facts), *report and recommendation adopted*, No. 1:07-CV-1614-CC, 2009 WL 10700325 (N.D. Ga. Feb. 11, 2009). Outback knew it had a duty to preserve this evidence because Plaintiff requested in her April 9th preservation letter "[a]ll incident reports or other reports concerning" the incident, and the two checklists indicate the conditions of the floor on the day of the incident. (Doc. 44-6 at 4; Doc. 45-1 at 28–29; Doc. 45-3 at 1; Doc. 52 at 59:5–60:17).

The relevant inquiry is whether the evidence is crucial to the case. Plaintiff has not established that it is. To the extent that Plaintiff believes that the checklists will provide evidence of the condition of the floor, Plaintiff has not established that the checklist is crucial. With regard to the floors, the opening manager's checklist has a section titled "miscellaneous." (Doc. 61-8 at 1). The second item on the list in that section is a checkbox for "Floors - clean, no grease build up; good condition." (*Id.*). Whether this box was

---

[6] In her closing brief, Plaintiff argues that the video lost because of Outback's spoliation is important in light of Outback's expert report that allegedly offers opinions about the condition of the floor on the date of Plaintiff's accident. (Doc. 74 at 10). She contends that Outback should not be allowed to offer an expert opinion about the condition of the floor as a spoliation sanction. (*Id.*). Plaintiff, however, does not cite the expert report to which she refers, and the Court cannot find any expert report submitted by Outback in the record. (*See id.*; Docket). Accordingly, the Court will not consider expert opinions when determining sanctions.

checked on the day in question is of limited evidentiary value, and Plaintiffs has not established that it is crucial. Furthermore, Plaintiff can establish the condition of the floor through her own deposition and Chambers' deposition, both of which provide more detailed evidence of the floor condition at the time of Plaintiff's accident. *See Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1327–28 (S.D. Fla. 2010) (finding evidence was not crucial to plaintiff's case because plaintiff obtained other evidence that could prove its case); (Doc. 52 at 61:12–68:8; Doc. 54 at 30:24–31:1).

Plaintiff also has not established that the Manager's Daily Log is crucial. Accepting for the purposes of this motion that managers are supposed to note information regarding accidents in the daily log, the only evidence produced is that the manager on duty when the accident occurred did not follow that procedure. Rather, Chambers testified that she texted her manager partner and did not note anything about the accident in the log. (Doc. 52 at 70:2–19). Furthermore, to the extent that incidents from the day of Plaintiff's fall were recorded in the daily log, Chambers, Hendrix, and Hunsinger have given deposition testimony setting forth that information. (*See* Doc. 50 at 40:17–41:9; Doc. 52 at 68:16–20; Doc. 61-16 at 3:10–23). Regarding the "other 'more detailed' inspection reports" Plaintiff references, the Court cannot provide any legal analysis for these documents as Plaintiff does not specify what they are and how they are crucial for her case.

**B.  Surveillance Video**

Defendants do not dispute that there was spoliation with regard to the surveillance footage. (Doc. 45 at 1). Rather, Defendant's arguments focus on the appropriate sanction, if any. (*Id.*). Regarding sanctions, there is little question that Plaintiff has satisfied the first three *Flury* factors. First, Plaintiff is prejudiced by the absence of the surveillance footage because the footage is impartial and indisputably captured the area where Plaintiff slipped and fell as well as the actual fall. *See Abdulahi v. Wal-Mart Stores E., L.P.*, 76 F. Supp. 3d 1393, 1397 (N.D. Ga. 2014); (Doc. 52 at 22:7–15). Second, the prejudice cannot be cured. Hunsinger is the only witness who saw Plaintiff fall, but he saw the incident from the other side of the room. There is no witness perspective that can substitute the viewpoint that the video footage would show. *See Abdulahi*, 76 F. Supp. 3d at 1397. Third, the video is

practically important for showing exactly how Plaintiff slipped and fell, and potentially whether other patrons previously slipped or fell in the same area around the same time. *See id.*

Defendant's primary argument against sanctions is that there was no bad faith, the fourth *Flury* factor. Courts in the Eleventh Circuit draw an adverse inference "from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Alston*, 750 F. App'x at 835 (quoting *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009)). "Generally, bad faith may be found where the plaintiff's actions are responsible for the spoliation of evidence and 'the plaintiff fully appreciated the significance of the evidence to the anticipated litigation.'" *Oil Equip. Co. v. Modern Welding Co.*, 661 F. App'x 646, 653 (11th Cir. 2016) (per curiam) (citation omitted). Courts "should weigh the degree of the spoliator's culpability against the prejudice to the opposing party" when deciding whether sanctions are warranted. *Est. of James v. Weigele*, No. 1:14-CV-4027-CAP, 2015 WL 12683822, at *7 (N.D. Ga. Aug. 13, 2015) (citation omitted). "As such, 'mere negligence in losing or destroying records is not sufficient to draw an adverse inference.'" *Alston*, 750 F. App'x at 835 (quoting *Mann*, 588 F.3d at 1310). But malice or ill-will is not necessary for a showing of bad faith, and purposely allowing crucial evidence to be removed from one's possession alone can constitute bad-faith spoliation. *Hyundai Motor Am. Corp. v. N. Am. Auto. Servs., Inc.*, No. 20-82102-Civ-Middlebrooks/Matthewman, 2021 WL 3111191, at *9–10   (S.D. Fla. July 22, 2021) (collecting cases).

The Eleventh Circuit has distinguished bad faith from negligence based on whether the alleged spoliator purposely lost or destroyed the evidence. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184–85 (11th Cir. 2020) (collecting cases). Purposely losing evidence includes allowing the evidence to be removed from one's possession while knowing that the evidence needs to be preserved. *See id.* (citing *Flury*, 427 F.3d at 940–42, 94–47). Here, Defendants allowed the evidence to be destroyed while knowing that it needed to be preserved. Hall's emails make clear that Outback's risk management knew and communicated to the local store manager that the video needed to be preserved. As

Defendant has not responded to discovery regarding what steps were taken to preserve the evidence or, evidently, done any investigation into what actually happened, we do not know how exactly the video was lost. What we know is that Defendant knew it had a duty to preserve the video, and allowed the video to be lost or removed from their possession despite that knowledge. What happened here is similar to *Flury*. In *Flury*, the plaintiff sued the manufacturer of his car after the airbags did not inflate during an accident. *Flury*, 427 F.3d at 940. The manufacturer expressed a desire to inspect the car. *Id.* at 940–42. The plaintiff did not respond to the request and allowed the car to be sold for salvage. *Id.* Here, it was Outback's own risk management that sought the opportunity to inspect the video. That request was ignored. In fact, the only response to the request was an email from an unknown person, presumably an employee with access to an Outback email account, blaming the Plaintiff for the fall, saying the floor was dry, and sending four "snapshots" of the area where it occurred. (Doc. 44-5). Thereafter, the video surveillance was destroyed. Thus, as was the case in *Flury*, the local Outback employees were "fully aware that [risk management] wanted to examine the [video]," but "ignored [risk management's] request and allowed the [video to be destroyed]." *Flury*, 427 F.3d at 945. As the court did in *Flury*, the Court here infers bad faith on the part of the Outback store to prevent the inspection of the video.

Moreover, bad faith is not present where evidence is destroyed under routine policies or procedures and the policies themselves do not indicate bad faith. *Id.* at 1185; *Moore v. Intuitive Surgical, Inc.*, No. 1:15-CV-056 (LAG), 2019 WL 10784545, at *2 (M.D. Ga. Apr. 3, 2019) (citing *Bashir v. Amtrak*, 119 F.3d 929, 932 (11th Cir. 1997)). But a corporation's inexplicable failure to follow its own retention practices can constitute bad faith. *See Hyundai Motor Am. Corp.*, 2021 WL 3111191, at *10 ("Defendants have demonstrated that the loss of the engines was solely caused by Plaintiff's inexplicable failure to ensure compliance with a preservation email reflecting its own internal policies."). Such is the case here. Outback's video retention policy requires preserving surveillance footage for about fourteen days. (Doc. 61-14 at 40:15–41:7). Both Chambers and Hendrix's testimony demonstrate that Outback is supposed to collect and retain all

pertinent evidence of an accident, including video footage. (Doc. 50 at 14:19–15:5; Doc. 52 at 22:7–24:12). Additionally, Nichols testified that managers are supposed to relay any information regarding accidents to the risk-management department and are sometimes instructed to send risk management additional information about the incident within a certain time frame. (Doc. 49 at 32:14–17, 32:25–33:1). Chambers' and Hendrix's testimony is corroborated by Hall's emails in which she asked Outback to promptly send any surveillance of the fall on three separate occasions, beginning one day after Plaintiff's incident and within Outback's fourteen-day video-retention timeframe. (Docs. 44-2 to 44-4, Doc. 61-14 at 40:15–41:7). Notably, in her email sent to Outback on February 27, 2019, Hall notes that she "sent a couple emails over in the past week and ha[d] yet to hear back from anyone." (Doc. 44-4 at 1). She also re-requested the surveillance video and noted that Plaintiff had spoken with an attorney. (*Id.*). There is no question that Outback had a duty to preserve the video for at least fourteen days under its own policy and practice.[7]

---

[7]       At the evidentiary hearing, Outback cited *Canales v. Pilot Travel Centers LLC*, No. 7:19-CV-100 (WLS), 2020 WL 8093583 (M.D. Ga. Nov. 30, 2020), as an example in which the Court found that the defendant company did not breach its duty to preserve a surveillance video even though a manager reviewed the footage showing the plaintiff's injury. (Doc. 73 at 30:24–31:25; *see also* Doc. 75 at 3). In *Canales*, the Court found that the defendant's parent company only kept surveillance footage for two weeks, and the plaintiff did not contact the defendant for almost two months. *Canales*, 2020 WL 8093583, at *10 (citations omitted). The Court, therefore, held that the spoliation rules had not been triggered because the defendant had no notice that the injured party was contemplating litigation. *Id.* The Court also held that the video evidence was not crucial to the plaintiff's prima facie case. *Id.* at *11. Here, however, Hall requested the surveillance footage within Outback's fourteen-day policy. (Docs. 44-2 to 44-4). Additionally, the duty to preserve evidence arises when litigation is reasonably foreseeable from the perspective of the party controlling the evidence. *Phillips v. Harmon*, 774 S.E.2d 596, 604 (Ga. 2015); *see also Flury*, 427 F.3d at 944 ("Georgia state law on spoliation is wholly consistent with federal spoliation principles."). Outback knew—at most—six days after the incident that Plaintiff was contemplating litigation because Hall informed Outback in her February 27, 2019, email that Plaintiff had spoken with an attorney, and in that message, Hall requested the surveillance video for the third time. (Doc. 44-4 at 1); *see also Kitchens v. Brusman*, 694 S.E.2d 667, 671 (Ga. Ct. App. 2010) (finding defendant knew plaintiff was contemplating litigation because a plaintiff's lawyer had been investigating and asking for medical records before filing the lawsuit).

        Moreover, Outback was put on constructive notice of litigation the day after Plaintiff's incident as Hendrix called an ambulance for Plaintiff after she fell, an employee from Outback's corporate office called Plaintiff the day after the incident while she was in the hospital, and Hall began asking for the surveillance video the day after Plaintiff's fall. (Doc. 50 at 20:17–23; Doc. 54 at 57:8–22); *see also Wiedeman v. Canal Ins. Co.*, No. 1:15-cv-4182-WSD, 2017 WL 2501753, at *3 (N.D. Ga. June 9, 2017) (holding a variety of circumstances can constitute constructive notice, including the type and extent of the injury, the degree to which fault is clear, the potential financial liability, the relationship and interactions between the parties, the parties' actions or inactions after the injury, and the defendant's initiation and extent of an internal

Moreover, Outback concedes that not preserving the surveillance footage was "a failure to follow procedures or requests[.]" (Doc. 45 at 2).

Outback attempts to construe this failure as being less than bad faith, but "throwing up its hands and not properly following" its own training, policy and procedures, and instructions from its holding company constitutes bad faith spoliation. *See Hyundai Motor Am. Corp.*, 2021 WL 3111191, at *10. Outback blames the failure to preserve the video on a temporary change in management. (Doc. 45 at 2). But this does not mitigate Outback's failure, especially because multiple Outback personnel were on notice one day after Plaintiff's fall that that the risk-management department needed the video footage and Plaintiff had contacted a lawyer.

Outback's inability to explain what happened to the video compounds its bad faith spoliation. *See Hyundai Motor Am. Corp.*, 2021 WL 3111191, at *10 (finding bad faith where plaintiff's counsel admitted there was no "evidence to explain how or why the [lost evidence] went missing" and that he "didn't 'think anybody ever checked to see that [the lost evidence was] being physically retained.'"); *Woodard v. Wal-Mart Stores E., LP*, 801 F. Supp. 2d 1363, 1368, 1375 (M.D. Ga. 2011) (finding the disappearance of a videotape supported an inference of bad faith against Wal-Mart where Wal-Mart's policies "comprehend the need to evaluate and retain any videotape evidence of a trip-and-fall incident and then forward it to" the claims department, and Wal-Mart could only speculate as to how the video disappeared). *But see Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao E Exportacao LTDA*, No. 1:08-cv-20738-KMM, 2012 WL 12844563, at *2 (S.D. Fla. June 16, 2012) (finding no bad faith where defendants offered a "plausible, although pitiful, reason for the lack of" preserved and disclosed evidence).

Here, as in *Hyundai Motor America Corporation*, the "inexplicable failure by a large sophisticated corporation" like Outback "to ensure compliance with [Plaintiff's] preservation email was not merely negligent. It is far worse." 2021 WL 3111191, at *10. Thus, Plaintiff has demonstrated that spoliation sanctions are warranted against Outback.

---

investigation). Further, the surveillance video is crucial to Plaintiff's prima facie case as previously explained. Thus, *Canales* is inapplicable to this matter.

**C. Sanctions**

Plaintiff requests the Court to find intent and enter a default judgment against Outback. (Doc. 44 at 14). Alternatively, Plaintiff requests the Court to allow evidence of Outback's conduct, give a jury instruction that it must presume the lost information was unfavorable to Outback, or provide any other appropriate relief. (*Id.*). Appropriate sanctions for spoliation "may include '(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator.'" *Tesoriero*, 965 F.3d at 1184 (citing *Flury*, 427 F.3d at 945). Sanctions are determined on a case-by-case basis. *In Matter of Complaint of Bos. Boat III, L.L.C.*, 310 F.R.D. 510, 523 (S.D. Fla. 2015). When constructing an adverse jury instruction, the Court can: (1) deem that certain facts are admitted and must be accepted as true; (2) impose a mandatory, rebuttable presumption; or (3) require the jury to presume that the lost evidence is relevant and favorable to Plaintiff, but also evaluate the spoliating party's rebuttal evidence and then determine whether to draw an adverse inference. *Hyundai Motor Am. Corp.*, 2021 WL 3111191, at *14. Because there is no evidence that Outback intentionally destroyed the surveillance and Plaintiff can still establish her case without it, a default judgment against Outback is not appropriate. Moreover, default judgment is extreme and only appropriate when lesser sanctions will not suffice. *See Navarro v. Cohan*, 856 F.2d 141, 142 (11th Cir. 1988) (per curiam) (citation omitted).

The following sanction, however, is warranted: the jury will be instructed to presume that the surveillance lost to spoliation was relevant and favorable to Plaintiff and unfavorable to Outback, but Outback can rebut this presumption with its own evidence. *See Hyundai Motor Am. Corp.*, 2021 WL 3111191, at *14 (collecting cases).

**II.    Discovery Delay**

Plaintiff argues that Outback did not produce the emails sent between February 22, 2019, and February 28, 2019 (Docs. 44-2 to 44-5) until she asked the Court to intervene. (Doc. 44 at 13). According to Plaintiff, these emails should have been produced in response to Plaintiff's initial discovery requests. (*Id.*). In response, Outback argues that information was provided as it was discovered, and it produced the four emails when it discovered

them. (Doc. 45 at 7). It asserts that it did not attempt to hide the emails and the production delay did not prejudice Plaintiff because the emails add nothing to the facts or Plaintiff's ability to prove her case. (*Id.*).

### A. Rule 26

Federal Rule of Civil Procedure 26(g) requires attorneys to sign discovery responses, which certifies them. Certification implicitly requires the signing attorney to reasonably inquire into the factual basis of his response, request, or objection. *Brown v. SSA Atl., LLC*, No. CV419-303, 2021 WL 1015891, at *5 (S.D. Ga. Mar. 16, 2021). Although the court ultimately decides whether an inquiry is reasonable, Rule 26(g) requires an attorney to ensure that the client provided all responsive information and documents available at that time. *Venator v. Interstate Res., Inc.*, No. CV415-086, 2016 WL 1574090, at *8 (S.D. Ga. Apr. 15, 2016). Rule 26(g) applies to disclosures under Rule 26(a)(1) and (a)(3), as well as discovery requests, responses, and objections. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1222 n.3 (11th Cir. 2017).

The purpose of discovery sanctions is to "penalize the offending party and deter others from engaging in similar conduct." *Steed v. EverHome Mortg. Co.*, 308 F. App'x 364, 370 (11th Cir. 2009) (citing Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment) (other citation omitted). The Eleventh Circuit has explained that Rule 26(g)(3) "only authorizes sanctions traceable to specific discovery abuses." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2007). If a certification violates Rule 26 without "substantial justification," courts can impose appropriate sanctions against the signer, the party for whom the signer acted, or both. Fed. R. Civ. P. 26(g)(3). The non-disclosing party has the burden of establishing that the failure to disclose was substantially justified, which requires enough justification to satisfy a reasonable person. *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006) (citations omitted); *Jordan v. Claudio Filippone, HolosGen, LLC*, No. 20-20023-Civ-SCOLA/TORRES, 2021 WL 1390370, at *2 (S.D. Fla. Apr. 13, 2021). For example, a party that did not comply with a discovery request must provide sufficient justification to convince a reasonable person that the failure to comply was acceptable. *See id.*

Federal Rule of Civil Procedure 33(b)(3) requires parties to fully answer each interrogatory in writing under oath to the to which extent it is not objected. On November 8, 2019, Plaintiff served Outback with a request for production of documents related to the surveillance video, efforts to preserve the surveillance video, and Outback's investigation of the accident, plus interrogatories requesting Outback to state the measures taken to preserve evidence related to this case, including surveillance video. (Plaintiff's First Request for Production of Documents to Defendants ¶¶ 2, 8, 10; Plaintiff's First Interrogatories ¶ 6). On December 6, 2019, Outback submitted signed responses and signed supplemental responses. (Docs. 44–45; Doc. 61-20 at 1–10; Docket).[8] Outback does not dispute that it did not provide complete responses to the Plaintiff's initial interrogatories and requests for documents, or that its responses were replate with general objections. (*See* Doc. 45 at 7). Plaintiff sent Outback a letter on December 19, 2019, requesting complete responses. (*See* Letter from Patrick Flynn). Outback assured Plaintiff it would produce additional documents and supplemental responses, but it ultimately did not. (*See* Email Chain 2). Plaintiff then requested the Court to intervene. (*Id.*).

On January 15, 2020—after Plaintiff requested the Court to intervene—Outback withdrew the general objections it made in its first response and sent Plaintiff supplemental responses. (Doc. 61-20 at 1). Sometime after that, Outback sent additional supplemental responses. (*See* Doc. 44 at 5). Yet Outback's responses remained incomplete as Plaintiff learned through depositions taken some eight months later, on August 13 and 14, 2020, that Outback had not produced all of the responsive documents. (*See* Email Chain 3). Plaintiff thereafter requested Outback to produce those documents. (Doc. 44 at 6). On September 1, 2020, Outback produced one additional document but indicated that it no longer had other responsive documents. (*Id.*). Accordingly, on September 15, 2020, Plaintiff again requested that the Court intervene. (Email Chain 3). The Court, by email, gave Outback an opportunity to respond to Plaintiff's assertions, but Outback did not

---

[8]  The record does not contain Outback's initial, signed responses to Plaintiff's first set of interrogatories and request for documents, but the Court can assume from the record that Outback sent its responses. (*See* Docs. 44–45; Docket).

respond. (*Id.*). On September 21, 2020, Outback emailed Plaintiff four additional emails—the emails from Hall requesting the video—and informed Plaintiff that it was still working on obtaining responsive information. (Doc. 44-1). The Hall emails were responsive to Plaintiff's initial request for production of documents and interrogatories, the December 19, 2019 letter requesting complete responses, and every follow-up attempt Plaintiff made to obtain complete, responsive information.

The record shows that Outback failed to produce responsive materials even after agreeing to do so and advising the Court that it would. *See Blaier*, 2021 WL 2451741, at *3. The emails at issue were sent to Outback employees between February 22, 2019, and February 27, 2019, so they were available to Outback when Plaintiff initially requested them on November 8, 2019. Outback offered Plaintiff no reason for failing to answer Plaintiff's initial interrogatories and request for documents completely and accurately or include the emails in its supplemental responses until after Plaintiff repeatedly requested the Court to intervene. Outback attempts to justify the delay by asserting that "[t]he information was provided as it was discovered" and that any prejudice was harmless and excusable due to the temporary change in management. This excuse is unacceptable as Defendants had a duty to respond and exhibited a marked lack of diligence in fulfilling that duty. Outback fails to provide a substantial justification for violating its duty, and the late disclosure of these emails shows that Outback did not reasonably inquire into the factual grounds for its representations and falsely certified that its discovery responses were complete and correct. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1350; *Venator*, 2016 WL 1574090, at *9 (finding defendants' supplemental email production illustrated that their original production was not complete and correct). That Outback eventually disclosed the emails does not mitigate its Rule 26 violation. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d at 1350.

"The decision whether to impose sanctions under Rule 26(g)(3) is not discretionary. Once the court makes the factual determination that a discovery filing was signed in violation of the rule, it must impose an 'appropriate sanction,'" regardless of whether Plaintiff was prejudiced. *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th

Cir. 1997); *Kipperman v. Onex Corp.*, 260 F.R.D. 682, 699 (N.D. Ga. 2009) (citation omitted). District courts have discretion, though, to determine what sanction is appropriate. *Chudasama*, 123 F.3d at 1372. Plaintiff does not specify what relief she seeks for Outback's failure to initially disclose the emails. The Court, therefore, orders Outback to pay one-half of the reasonable expenses and attorney's fees associated with filing and arguing the Motion for Sanctions.[9] *See Agilysys, Inc. v. Hall*, No. 1:16-CV-3557-ELR-JFK, 2019 WL 3483173, at *20 (N.D. Ga. May 29, 2019) (recommending the same sanction for plaintiff's failure to produce and timely supplement initial disclosures).

**B. Rule 37**

Federal Rule of Civil Procedure 37 "provides a district court with authority to impose sanctions, including dismissal, on a party for abuse of the discovery process." *Goodman v. New Horizons Cmty. Serv. Bd.*, No. 05-14717, 2006 WL 940646, at *1 (11th Cir. 2006) (citing *Phipps v. Blakeney*, 8 F.3d 788, 790 (11th Cir. 1993)). "A court may impose sanctions where a party fails to provide answers, objections, or a written response to interrogatories or requests for production." *Steed*, 308 F. App'x at 370 (citing Fed. R. Civ. P. 37(d)(1)(A)(ii)). Sanctions under Rule 37 can include: (1) payment of reasonable expenses the discovery failure caused; (2) establishing facts as the prevailing party claims; (3) preventing the disobedient party from objecting to established claims or presenting certain matters into evidence; (4) striking the pleadings partially or entirely; (5) staying the proceeding until the disobedient party complies with the order; (6) dismissing the action or proceeding partially or entirely; and (7) entering a default judgment against the disobedient party. *Id.* (citing Fed. R. Civ. P. 37(d)(3)). Rule 37(c) provides that a party that fails without substantial justification to disclose evidence under Rule 26(a) or Rule 26(e)(1) shall not be allowed to use that evidence "at a trial, at a hearing, or on a motion." *Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 368 (M.D. Ala. 2001). The non-disclosing party has the burden of proving its actions were either substantially justified or harmless. *Id.* (citation omitted); *see also Crawford v. ITW Food Equip. Grp.*, 977 F.3d 1331, 1341

---

[9]   As the sanctions motion and hearing dealt with issues beyond the dilatory responses, the Court will not require Defendants to pay the entire cost of the motion or hearing.

(11th Cir. 2020).

Courts may also impose sanctions under their inherent authority "to police those appearing before them." *Purchasing Power, LLC*, 851 F.3d at 1223 (citation omitted). This inherent power "is governed . . . by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* The inherent sanction power "must be exercised with restraint and discretion" to impose appropriate sanctions for litigation misconduct. *Id.* A court may exercise its inherent sanctions power "to sanction the willful disobedience of a court order, and to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (citation omitted).

Courts' inherent powers are based on a subjective bad-faith standard. *Id.* Subjective bad faith that unlocks a court's inherent sanctions power requires more than mere recklessness. *Id.* at 1225. Courts unsure of whether to sanction a party pursuant to inherent powers look to *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991). *Id.* There, the Supreme Court established that the sanctions "power is not a remedy for protracted litigation; it is for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial." *Id.* (citing *Chambers*, 501 U.S. at 44). "Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." *Id.*

Here, there is no clear evidence that Outback disobeyed a court order, but Outback's delayed disclosure of its emails with Hall could warrant sanctions under Rule 37. *See O'Berry v. Turner*, Nos. 7:15-CV-00064-HL, 7:15-CV-00075-HL, 2016 WL 1700403, at *2, 4 (M.D. Ga. Apr. 27, 2016) (finding Rule 37 sanctions appropriate where defendant failed to maintain relevant documents while the documents were in its sole possession and delayed contact with its "loss control manager" about the documents and a request for copies of them, despite plaintiff's counsel's numerous requests for the documents). There is no reason, however, to bar Outback's use of the information in the emails because the information therein seems to benefit Plaintiff. Rule 37 allows the Court to order outback to pay costs, but the Court has already imposed this award under Rule 26. The Court,

therefore, will not invoke Rule 37 or its inherent sanction power. *See Engeling v. Bashlin Indus.*, No. 4:17-CV-210-HLM, 2018 WL 8996380, at *8 (N.D. Ga. Sept. 20, 2018) (declining to impose a Rule 26 sanction where the court already imposed a Rule 37 sanction).

## CONCLUSION

In light of the foregoing, Plaintiff's Motion for Sanctions (Docs. 43–44) is **GRANTED**. Plaintiff is **ORDERED** to file a document specifying and itemizing the attorney's fees and expenses associated with her Motion for Sanctions within **fourteen (14) days** of the date of this Order. Outback may respond or object to this document within **fourteen (14) days** of Plaintiff's filing.

**SO ORDERED**, this 30th day of September, 2021.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, JUDGE**
**UNITED STATES DISTRICT COURT**